UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

NR DOE, MR DOE,
and AR DOE,

           Plaintiffs,

        v.                                     Case No. 09-C-0545

ST. FRANCIS SCHOOL DISTRICT,
COMMUNITY INSURANCE CORPORATION,
KELLY SWEET,

           Defendants.

        v.

COMMUNITY INSURANCE CORPORATION,

           Intervenor Defendant.

MEMORANDUM OF LAW SUPPORTING THE COURT'S SEPTEMBER 30, 2011,
ORDER GRANTING DEFENDANT ST. FRANCIS SCHOOL DISTRICT'S AND
INTERVENOR-DEFENDANT COMMUNITY INSURANCE CORPORATION'S
MOTIONS FOR SUMMARY JUDGMENT (DOCS. 63, 68)

On September 30, 2011, this court granted two motions for summary judgment filed by the St. Francis School District and Community Insurance Corporation ("CIC") seeking dismissal of the plaintiffs' remaining claims against St. Francis and CIC, and Kelly Sweet's indemnification cross-claim against CIC. The reasoning underlying that decision is set forth below.

SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548 (1986). In deciding a motion for summary judgment, the court must view all facts and draw all inferences from those

facts in the light most favorable to the non-moving party. *Schuster v. Lucent Technologies, Inc.*, 327 F.3d 569, 573 (7th Cir. 2003). However, the non-moving party may not simply rest on its allegations; rather, it must come forward with specific facts that would support a jury's verdict in its favor. *Van Diest Supply Co. v. Shelby County State Bank*, 425 F.3d 437, 429 (7th Cir. 2005). The non-moving party must show that the disputed fact is material, or outcome-determinative, under applicable law. *Local 1545, United Mine Workers v. Inland Steel Coal Co.*, 876 F.2d 1288, 1293 (7th Cir. 1989). However, credibility determinations "are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254, 106 S. Ct. 2505 (1986).

Mindful of this standard, certain proposed findings of fact proffered by plaintiffs were determined by this court to be legal conclusions, and, therefore, disregarded. Specifically, plaintiffs' expert, Dr. Marc Ackerman stated: "I have been asked to comment on whether the information which District officials had before March 9, 2008 showed a known or obvious risk of sexual misconduct by Ms. Sweet, such that the officials had actual knowledge of Ms. Sweet's conduct." (Ackerman Decl. Ex. 2, p. 2.) This statement by Dr. Ackerman is nothing more than a recitation of the first element for a Title IX sexual harassment claim, which requires (1) actual knowledge and (2) deliberate indifference. Also, Dr. Ackerman concluded, in part, that "The school district's failure to take any action following the additional reporting by Ms. Gridley on February 25 shows a total disregard for the safety and welfare of NR Doe." (Ackerman Decl. Ex. 2, p. 5.) As with Dr. Ackerman's earlier statement, this opinion expresses a legal conclusion within the province of this court. Further, determining whether a defendant has displayed deliberate indifference to a plaintiff's rights is distinctly the province of the fact-finder at trial. In addition, Dr.

2

Ackerman is the sole source to state that "Talking to Ms. Sweet and asking her if there was a problem, and relying on her denial without doing anything else, was negligence on the part of Terry Balster and Carol Topinka." (Ackerman Decl. Ex. 2, p. 5.) Because it would be improper to rely on Dr. Ackerman's conclusions of law, the court disregarded plaintiffs' Proposed Findings of Fact ¶¶ 75-80, as well as any other proposed finding resting solely upon Dr. Ackerman's legal conclusions.

The court also notes that several briefs were filed improperly. They contained arguments that are extraneous, in part or in their entirety, including plaintiffs' brief opposing CIC's summary judgment motion on Sweet's cross-claim (doc. 77), Sweet's brief opposing St. Francis School District's summary judgment motion on plaintiffs' claims (doc. 89), Sweet's response to St. Francis School District's amended proposed findings of fact (doc. 90), and St. Francis School District's reply to Kelly Sweet's response to St. Francis School District's amended proposed findings of fact (doc. 102). To clarify, St. Francis moved for summary judgment against plaintiffs for the claims to which CIC joins as St. Francis's insurer, and CIC moved for summary judgment against Sweet's cross-claim.

FINDINGS OF FACT

The undisputed facts establish that plaintiffs are a minor student, NR Doe, and his parents. (Am. Compl. ¶¶ 1-2.) At all relevant times, NR Doe was a seventh and eighth grade student at Deer Creek Middle School in the St. Francis School District. (NR Doe Dep. at 18; Am. Compl. ¶ 10.) St. Francis is organized under Wisconsin law and is within the jurisdiction of this court. (Am. Compl. ¶ 3.)

Defendant Kelly Sweet is a teacher formerly employed by St. Francis at the Deer Creek Middle School. (Sweet Dep. at 8, 116-7.) She was suspended by St. Francis on

3

March 17, 2008, and her employment was formally terminated by the School Board for the School District effective August 25, 2008. (Sweet Dep. at 116-7.) While employed by St. Francis, Sweet taught classes attended by NR Doe. (NR Doe Dep. at 19-20.)

In October 2007, NR Doe broke his leg and could not participate in physical education class. (NR Doe Dep. at 26.) When the rest of the class went to physical education, NR Doe reported to Sweet's classroom. (NR Doe Dep. at 31-2.) Sweet was known to NR Doe's family, having coached his sisters. (NR Doe Dep. at 60-1.) When NR Doe was picked up from school, Sweet carried his bags and books to his mother's car. She also spoke with NR Doe's mother regularly. (Gridley Decl. ¶ 9; Sweet Dep. 23-4.) NR Doe's parents were appreciative of Sweet's help. (NR Doe Dep. at 61.)

Sweet and NR Doe interacted several times outside of school hours, including an occasion when NR Doe and six other students painted Sweet's classroom (NR Doe Dep. at 32-4.), and when Sweet and NR Doe went to dinner and attended a Milwaukee Buck's basketball game in February 2008, with the permission of NR Doe's parents (NR Doe Dep. at 45-8; Sweet Dep. at 23.). Sweet coordinated the classroom painting through text messages, and communicated verbally regarding the Milwaukee Bucks game.[1] (NR Doe Dep. at 37, 45-8; Sweet Dep. at 23.) The text messages became inappropriate after NR Doe and Sweet attended the Milwaukee Bucks game. The exchanges included apparent requests to be each other's boyfriend and girlfriend and related messages. (NR Doe Dep. at 48-50.)

---

[1]NR Doe and Sweet both deleted text messages when they realized a message had been discovered. (NR Doe Dep. at 98-99; Sweet Dep. at 70.) Both phones were confiscated by the Milwaukee police department. (District PFOF ¶ 78.) The phones have not been recovered despite due diligence by all parties, including subpoenas. (District PFOF ¶ 78.)

4

Apparently, NR Doe and Sweet exchanged text messages from February until at least March 9, 2009. (NR Doe Dep. at 48-50.) Through text messages and without the knowledge of NR Doe's parents, NR Doe and Sweet arranged to go to dinner and to her apartment.[2] (NR Doe Dep. at 58-60.) However, on March 9, after Sweet picked up NR Doe at his home, in her personal vehicle, they decided that dinner could wait, and drove to her apartment. (NR Doe Dep. at 64-65.)

At Sweet's apartment, NR Doe and Sweet watched most of a movie and had sexual contact. (NR Doe Dep. at 69.) Although no clothes were removed, Sweet and NR Doe engaged in kissing and touching. (NR Doe Dep. at 68-76.) Eventually, Sweet plead guilty to Fourth Degree Sexual Assault, Wis. Stat. § 940.225(3m).[3] (*Id. cf.* Sweet Dep. at 118-20.)

In Wisconsin, Fourth Degree Sexual Assault involves sexual contact with a person without their consent and is a Class A misdemeanor. Sweet knew that sexual contact with NR Doe was against the law (Sweet Dep. at 56-57), and that she and NR Doe had to keep their relationship – before and after it became sexual in nature – a complete secret. (Sweet Dep. at 39.) Neither Sweet nor NR Doe told anyone about their relationship. (Sweet Dep. at 39; NR Doe Dep. at 82-4.)

About one week after NR Doe was at Sweet's apartment, his sister discovered Sweet's sexual text message on his phone. (NR Doe Dep. at 86-90.) The sister forwarded

---

[2]NR Doe's parents knew that NR Doe was going to dinner, but not that he was going to Sweet's apartment. (NR Doe Dep. at 59-60.)

[3]Sweet contends in her improperly filed brief that they did not go beyond kissing and minor touching. NR Doe contends that the kissing and touching was more intense, including placing his hand in her pants. The failings of Sweet's brief are discussed below, but the brief does accurately rely on information in the record.

5

the text to their mother. (NR Doe Dep. at 86-90.) The police became involved, and NR Doe was withdrawn from Deer Creek. (NR Doe Dep. at 91, 111.)

On March 16, 2008, Sweet went to the home of Deer Creek Principal Balster for a meeting that lasted less than 10 minutes. (Balster Dep. at 84, 85.) She informed him that, while in Madison, Wisconsin, she sent a flirtatious text message to NR and that it had been discovered by NR Doe's parents. (Balster Dep. at 84-5.) Immediately Balster advised her to contact the teacher union president, and ended the meeting to consult with St. Francis Superintendent Topinka. (Balster Dep. at 85.) After speaking with Topinka, Balster suspended Sweet indefinitely. (Balster Dep. at 85-86.) The following day, police detectives informed St. Francis that more than a single flirtatious text had been sent by Sweet. (Balster Dep. at 87.)

During all times relevant, Sweet and NR Doe did not have conversations of a sexual nature or exchange text messages on the Deer Creek campus. (Sweet Dep. at 28.) All messages of a sexual nature were exchanged while Sweet and NR Doe were off campus. (Sweet Dep. at 31.) Sweet knew that she was not allowed to send these text messages to NR Doe or have this relationship, and that she would be terminated by St. Francis if she was caught. (Sweet Dep. at 29.) However, she stated in deposition that her belief was that attending a Milwaukee Bucks game with NR Doe was within the scope of her duties as a teacher. (Sweet Dep. at 27.) St. Francis and its employees acting within the scope of employment are insured by CIC. (CIC PFOF ¶ 4.)

Deer Creek and St. Francis policy banned verbal and physical conduct of a sexual nature. (Sweet Dep. at 67-8; District Ex. 30 and 31.) Moreover, Sweet's relationship with

NR Doe violated the policy of Deer Creek's Student/Parent Handbook and St. Francis's sexual harassment policies. (Sweet Dep. at 68-70.)

In October 2007, an eighth grade teacher at Deer Creek observed that Sweet's students were becoming loud and disorderly, sat on desks, and drew on white boards. (Gridley Decl. ¶ 7.) She favored certain students, and she exchanged text messages with her students. (DeWayne Dep. at 37.)[4]  Sweet's actions were observed by other teachers who approached Sweet, as well as school and district administration. (Gridley Decl. ¶¶ 13-5; Topinka Dep. at 10.)

Three eighth grade teachers – Peter Graven, Elizabeth Gridley, and Michelle DeWane – had concerns regarding Sweet's abilities as a teacher. Gridley believed that "something was not right" about NR Doe's and Sweet's relationship. (Gridley Decl. ¶¶ 10-1.) Gridley told Sweet that NR Doe had a crush on her, and that she should be careful when dealing with NR Doe. (Gridley Decl. ¶ 11.) Gridley and DeWane thought that it was "unusual and weird" that Sweet would carry NR Does' bags and books. (Gridley Decl. ¶ 9.) By late 2007, some teachers learned that Sweet exchanged text messages with students. (Gridley Decl. ¶ 15.) These teachers advised administrators that they were concerned about Sweet's teaching abilities. At least three times, Graven expressed concern over Sweet's favoritism of students. (Graven Dep. at 38.) In December 2007, Gridley spoke with Balster regarding Sweet's classroom control, and in early 2008, Gridley expressed concern that Sweet had an inappropriate relationship. (Gridley Decl. ¶¶ 16, 17.)

---

[4] Dewane was not sure if the favoritism was inappropriate. (Dewane Dep. at 37.)

7

Additionally, several teachers met with Balster to discuss their concerns regarding Sweet. (Gridley Decl. ¶ 19.) During this meeting, Gridley informed Balster that NR Doe had a crush on Sweet. (Gridley Decl. ¶ 19.) Gridley also informed Balster that the relationship between Sweet was inappropriate and there was a problem. (Gridley Decl. ¶ 19.)

After the meeting, Gridley informed Topinka that the relationship between NR Doe and Sweet was inappropriate, that NR Doe had a crush on Sweet that she did not discourage, and that their relationship was like an eighth grade girlfriend-boyfriend relationship. (Gridley Decl. ¶ 23.)

Deer Creek administrators and St. Francis administrators investigated these concerns. Balster met with Sweet after Gridley's 2007 complaint, and denied there was a problem. (Gridley Decl. ¶ 18.) In response to the joint meeting with several teachers, Balster met with Sweet again. (Balster Dep. at 64-6.) Sweet promised never to text on the job in the future. (Balster Dep. at 65-6.)

After notice of these concerns reached St. Francis Superintendent Topinka, Topinka directed Balster to investigate them. (Topinka Dep. at 11.) Balster met with Sweet again. (Balster Dep. at 76.) Sweet informed Balster that her relationship with her colleagues had deteriorated, and that she had not "crossed any lines." (Balster Dep. at 77-81.) Balster found no evidence to conclude that anything was wrong or improper. (Balster Dep. at 81.)[5]

St. Francis Superintendent Topinka initiated her own investigation because of multiple reports regarding Sweet's professional behavior, and was not satisfied with

---

[5]Plaintiffs dispute this, arguing that Balster did not look for any evidence. While the court will discuss its analysis below, it is clear that no specific factual evidence against Sweet arose from Balster's meetings with Gridley or Sweet.

8

Balster's report.  (Topinka Dep. at 13.)  She interviewed Graven and DeWane once, and Gridley twice.  (Topinka Dep. at 14.)  Topinka asked each if Sweet was doing anything illegal and each said "no."  (Topinka Dep. at 16-7.)  In addition, each expressed concern respecting Sweet's favoritism of students and blurring the line between student and friend.  (Topinka Dep. at 13-23.)  None of the teachers offered evidence to substantiate their concerns.  (Topinka Dep. at 22.)

After her investigation, Topinka met with Sweet.  (Topinka Dep. at 23-5.)  Topinka outlined the concerns that the three teachers had provided.  (Topinka Dep. at 23-5.)  In response, Sweet denied any wrongdoing.  (Topinka Dep. at 25.)  Topinka believed her.  (Topinka Dep. at 26-7.)[6]  In deposition, Sweet admitted that during her meeting with Topinka she denied having an inappropriate relationship with NR Doe.[7]  (Sweet Dep. at 45.)

On the night of February 21, 2008, Sweet and several Deer Creek teachers, including DeWane and Gridley, met for dinner.  (Gridley Decl. ¶¶ 25-6.)  This dinner occurred after Balster and Topinka had met with various teachers.  (Gridley Decl. ¶¶ 25-6.)  After arriving as a group at Sweet's condominium, an argument began.  (Gridley Decl. ¶¶ 26-9.)  Sweet accused several teachers of informing on her.  (Gridley Dec. ¶ 26.)  DeWane accused Sweet of carrying on an inappropriate relationship.  (Gridley Decl. ¶ 27.)  Gridley said that NR Doe was a little boy, and that Sweet's relationship with him must stop.

_____

[6]St. Francis characterizes this as a lie.  Plaintiffs attempt to dispute this fact, relying on statements that Gridley had informed Topinka that Sweet could manipulate her emotions quickly and easily.  Whether Topinka was duped, or whether Sweet was providing accurate information is not the subject of this finding of fact; plaintiffs have not disputed that Topinka believed Sweet.

[7]Plaintiffs attempt to dispute this fact by arguing that Sweet said it in deposition.  Whatever the utility of that reliance, plaintiffs have not presented specific facts to draw the issue into dispute.

9

(Gridley Decl. ¶ 28.)  She also said that NR Doe liked Sweet, and that it was wrong. (Gridley Decl. ¶ 28.)  Sweet smiled.  (Gridley Decl. ¶ 28.)  Gridley demanded Sweet's phone to see text messages that Sweet's phone had received during the argument. (Gridley Decl. ¶ 29.)  Sweet refused, saying "not!"  (Gridley Decl. ¶ 29.)

Gridley telephonically advised Topinka of this event on February 25, the next school day.  (Gridley Decl. ¶ 31.)  She described the argument, stated that the situation between NR Doe and Sweet was very serious, and added that NR Doe was at risk.  (Gridley Decl. ¶ 31.)  Gridley repeated that Sweet was a liar and could manipulate her emotions.  (Gridley Decl. ¶ 31-2.)  Topinka informed Gridley that she did not have any evidence that Sweet had done anything wrong.  (Gridley Decl. ¶ 32)  And, Gridley did not offer specific facts that Sweet had done anything wrong.  (*See generally* Gridley Decl. ¶¶ 25-32.)

One of the issues in this case is whether Sweet has a right to a defense and indemnity under St. Francis's insurance policy with regard for that issue, the court finds that CIC issued a policy of insurance to the St. Francis School District covering the policy period alleged in the complaint; said policy is subject to all its terms, conditions, limitations and exclusions contained therein.  (06/25/10 Knee Aff., Policy, Ex. A.)  The policy provides coverage relevant to this action for several separate types of alleged damages: (1) bodily injury; (2) personal injury; and (3) error and omissions.  (Knee Aff., Ex. A, Policy, p. 1.)

CIC's insurance policy issued to the St. Francis School District defines an insured as follows:

> Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations.  The words "we", "us" and "our" refer to the company providing this insurance. The word "insured" means any person or organization qualifying as such under Section III - Who is an insured.

10

***

<u>SECTION III - WHO IS AN INSURED</u>

Insured means:

    1.    You, and

    2.    Your past or present employees or elected or appointed officials while acting within the scope of their employment or authority, authorized volunteers while acting for you or on your behalf, including your students, and all commissions, agencies, boards, districts, authorities, PTA's PTO's, Booster Clubs or similar entities when you retain the right to control the details of the work of these individuals or entities.

(Knee Aff., Ex. A, Policy, p. 16.)

"Personal injury" coverage is defined to mean:

... injury, other than "bodily injury," arising out of one or more of the following offenses:

    1.    False arrest, detention, or imprisonment, defective service of process;

    2.    Malicious prosecution;

    3.    Wrongful entry or eviction, or other invasion of the right of private occupancy;

    4.    Libel, slander or defamation of character;

    5.    Sexual Harassment;

    6.    Assault and battery, including "sexual molestation";

    7.    Discrimination or other civil rights violation.

(Knee Aff., Ex. A., Policy, p. 17.)

Errors and omissions coverage is defined as follows:

11

> ... any misstatement or misleading statement or act or
> omission or neglect or breach of duty including misfeasance,
> malfeasance and nonfeasance by an insured in their capacity
> as such.

(Knee Aff., Ex. A, Policy, p. 6.)

There is an exclusion in CIC's policy for "personal injury" "arising out of the willful violation of a penal statute," excluding coverage as follows:

SECTION V- EXCLUSIONS

\* \* \*

K.    "Personal injury" ... arising out of:

\* \* \*

3.    Arising out of the intentional or knowing violation
of a penal code or ordinance committed by or
with the consent of any insured.

(Knee Aff., Ex. A, Policy, p. 4.)

Plaintiffs filed suit against the St. Francis School District and Sweet relating to their claim that Sweet pursued an inappropriate relationship with NR Doe, including without limitation that she made sexually suggestive comments to NR Doe, that she invited NR Doe to engage in sexual behavior, and that she sexually abused and assaulted NR Doe in March of 2008. (Am. Complaint.) CIC filed an intervenor complaint requesting a declaration that CIC has no duty or obligation to defend and indemnify Sweet for the claims asserted by the plaintiffs in their complaint. (Intervenor Complaint.) This court, on the stipulation of the parties, has since dismissed all claims against the St. Francis School District and CIC with the exception of the following allegedly implicating coverage under CIC's policy:

12

      a.      A claim for sexual harassment against the District under 20 U.S.C. § 168 (Am. Complaint, Count 3, ¶¶ 22-26.); and

      b.      A claim for negligent infliction of emotional distress against the District based on Sweet's alleged sexual contact and harassment. (Am. Complaint, Count 5, ¶¶ 31-34.)

Sweet filed a cross-claim against CIC requesting a declaration CIC has a duty or obligation to defend and/or indemnify Sweet for the claims asserted by the plaintiffs in their complaint, and Sweet continues to claim the right to a defense and indemnity for the following of plaintiffs' claims;

      a.      A claim for violation of the constitutional right to bodily integrity through 42 U.S.C. § 1983 against Sweet. (Am. Complaint, Count 1, ¶¶ 14-17.)

      b.      A claim for intentional infliction of emotional distress brought against Sweet based on alleged sexual contact. (Am. Complaint, Count 6, ¶¶ 35-38.)

      c.      A claim for negligent infliction of emotional distress based on alleged sexual contact and harassment. (Am. Complaint, Count 7, ¶¶ 39-42.)

## CONCLUSIONS OF LAW

Title IX prohibits sexual discrimination in educational programs or activities that are supported by federal financial aid. 20 U.S.C. § 1681(a). Private rights of actions exist for Title IX claims. *Cannon v. Univ. of Chi.,* 441 U.S. 677, 717(1979). Also, a teacher's sexual harassment of a student exposes the school to liability. *Franklin v. Gwinnett County Pub. Sch.*, 503 U.S. 60, 75 (1992). However, to recover against the school, a plaintiff must prove that an official of the district with authority to institute corrective measures: (1) has

13

actual notice of the misconduct; and (2) is deliberately indifferent to the misconduct. *Gebser v. Lago Vista Independent School District*, 524 U.S. 274, 290 (1988).

In the Seventh Circuit, a plaintiff must prove actual knowledge of misconduct -- not just actual knowledge of risk of misconduct -- and must prove that the officials having knowledge decided not to act on it. *Hansen v. Board of Trustees of Hamilton Southeastern School Corp.*, 551 F.3d 599, 605 (7th Cir. 2008). Actual knowledge of the discrimination or harassment is still the requirement; "should have known" is not. *Id.*

St. Francis and CIC maintain they did not have sufficient evidence to establish they had knowledge of Sweet's misconduct, and they did not react with deliberate indifference to the reports of suspicion concerning Sweet. Plaintiffs respond claiming St. Francis administrators were warned explicitly that Sweet was engaging in gender based misconduct with NR Doe, and that the actions of St. Francis were clearly unreasonable in light of those warnings.

Relying heavily on the events of February 25, 2008, plaintiffs argue that St. Francis "turn[ed] a blind eye" to the immediate and serious risk to NR Doe posed by his relationship with Sweet. (Pl. Br. (Doc. 76) at 19.) Essentially, plaintiffs ask the court to find a genuine issue of material fact by citing: (1) the character conclusions of Deer Creek teachers who found that Sweet's relationship with NR Doe was unusual, weird and inappropriate; (2) Sweet's behaviors such as smiles, outbursts, refusal to allow other teachers to inspect her phone; and (3) Sweet's poor ability to control her classroom.

Viewing the facts in the light most favorable to plaintiffs, Balster and Topinka are the two administrators who had the authority to institute corrective measures. While plaintiffs provided evidence to show that Sweet may be a poor educator, they have not provided

14

specific facts establishing that Balster or Topinka knew that Sweet was sexually harassing or discriminating against NR Doe. Indeed, plaintiffs' argument stretches mere suspicions beyond its limits, and largely ignores three fatal facts. First, Topinka asked Graven, DeWane, and Gridley directly whether Sweet was doing anything illegal, and each said no. Second, when Topinka asked Gridley if Gridley had any evidence that Sweet had done anything wrong after the night of February 21, Gridley said no. Finally, in deposition, Gridley stated "I didn't tell anyone I believed it [the relationship] was sexual because I didn't believe it was sexual." (St. Francis Reply (doc. 97) at 2.)

The complaints against Sweet were nothing more than specific facts that she was a poor teacher. But, mere suspicions are insufficient to prove actual knowledge that Sweet engaged in misconduct. Among the facts actually known by Balster or Topinka are that Sweet had a loud, silly, and disorderly class. Her students sat on desks, and drew on white boards. Sweet exchanged text messages with her students, favored certain students, and carried NR Doe's books and bags when he broke his leg. However, none of this indicates that Sweet was harassing NR Doe sexually.

Teachers advised Balster and Topinka of suspicions about Sweet. They said that Sweet's relationship with NR Doe was inappropriate, that there was a problem, and that Sweet was a liar who could manipulate her emotions. While these comments to Balster and Topinka may demonstrate that St. Francis had notice that Sweet was a poor employee, they did not provide St. Francis with actionable evidence or actual knowledge of any sexual harassment by Sweet of NR Doe.

Perhaps the most significant fact that plaintiffs provided is that Gridley told Balster that NR Doe had a crush on Sweet. However, this fact does not establish that St. Francis

15

had actual knowledge of Sweet's sexual harassment of NR Doe; this case is about Sweet's harassment of NR Doe, not NR Doe's harassment of Sweet.

Additionally, the undisputed facts show that St. Francis reacted promptly and swiftly to the teachers' suspicions. When teachers complained to Balster about Sweet, Balster interviewed the teachers and Sweet. He did so again when they complained again. He did so a third time on the instructions of Topinka. When Topinka was advised of the complaints, she investigated the matter also. After Sweet informed Balster that she had sent a flirtatious text to a student, she was suspended promptly. Thus, it is clear that St. Francis reacted with due concern to known facts. Consequently, under any view of these facts, the conduct of St. Francis does not reflect deliberate indifference to any misconduct Sweet engaged in with NR Doe.

Plaintiffs cite case law from various other jurisdictions[8] to show that the risks present in this case indicated to St. Francis that Sweet was engaging in "inappropriate behavior that would not occur but for the sex of the plaintiff." (Pl. Br. at 13)(internal citations omitted). Plaintiffs note: (1) Gridley's repeated statements to Balster that NR Doe and Sweet had an ongoing relationship, that Sweet "encouraged" NR Doe's crush on her, that NR Doe and Sweet had an 8th grade girlfriend-boyfriend relationship, and that the matter was serious; and (2) Graven's statements that Sweet and NR Doe either had a romantic relationship or that Sweet was trying to initiate one.

Plaintiffs contend that St. Francis's reliance on the interviews with teachers constitutes "an unduly narrow view of what constitutes sexual misconduct." (Pl. Br. at 15.)

_____

[8]Plaintiffs refer to only a single Court of Appeals case in a chain cite on Pl. Br. at 13.

16

However, under Seventh Circuit case law, the facts cited by plaintiffs do not indicate that St. Francis had knowledge of an imminent risk of harm to NR Doe. Indeed, the difference with this case and the case law cited by plaintiffs is that St. Francis interviewed teachers, asked specific questions about alleged misconduct, and knew that Gridley and Graven's statements were extraordinarily speculative. While this may constitute notice of some risk, there was no factual support for any conclusion of an imminent risk of harm to NR Doe. Put simply, the allegedly inappropriate relationship was not shown to be of a type that would not have existed but for NR Doe's gender, it was not certain that any risk to NR Doe would materialize, and the failure to act was not shown as reckless. St. Francis knew that Gridley and Graven believed that Sweet was a poor teacher, and that Gridley and Graven confronted Sweet on several occasions on and off campus, and that Gridley and Graven knew that Sweet and NR Doe's family were close.

When pressed for particulars to establish the basis for their conclusions that Sweet and NR Doe's relationship was romantic, or there was an eighth grade boyfriend-girlfriend relationship, it is undisputed that Gridley and Graven could not provide any factual support. However, for plaintiffs to succeed on their argument that St. Francis was cognizant that Sweet engaged in sexual misconduct with NR Doe that would not have occurred with a female, they would have to present facts showing there was clear risk to NR Doe and not mere suspicion. Moreover, St. Francis knew that Gridley and Graven did not like Sweet, and had made sweeping allegations against her without a factual basis. Most importantly, when provided an opportunity to be heard and to lay out specific facts, Gridley and Graven failed to offer any reliable information.

17

While a teacher and student going to a Milwaukee Bucks game may be "unusual and weird" in the opinion of Sweet's colleagues, this and other known interactions did not occur but for NR Doe's gender. Indeed, several interactions between Sweet and NR Doe were approved entirely or in part by NR Doe's parents. Ultimately, there is nothing more than a scintilla of evidence with respect to plaintiffs' Title IX claim against St. Francis.

Next, St. Francis and CIC argue that St. Francis is immune from liability for negligent infliction of emotional distress pursuant to Wis. Stat. § 893.80. Immunity cloaks any government agency for the intentional torts of its employees for discretionary acts. Wis. Stat. § 893.80(4); *DeFever v. City of Waukesha*, 2007 WI App 266 ¶ 7, 306 Wis. 2d 766, 743 N.W.2d 848. Significantly, public school districts are provided immunity under this statute from the performance of any discretionary act within the scope of their governmental employment. *Kierstyn v. Racine Unified Sch. Dist.*, 228 Wis.2d 81, 88 (1999). Several exceptions expose the school district to liability, particularly the known danger exception. *Umansky v. ABC Insurance Co.*, 2009 WI 82, ¶14 n.7, 319 Wis. 2d 622, 634, 769 N.W.2d 1.

The known danger exception is reserved for situations "more than unsafe." *Id*. Where the nature of the danger is compelling and "known to the [public] officer and is of such force that the public officer has no discretion not to act." *Nofke v. Bakke*, 2009 WI 10, ¶ 52, 315 Wis.2d 350, 760 N.W.2d 156. If the danger is obvious, the known danger exception "requires a public official to 'do something' to avert harm even if the necessary steps have not been spelled out in advance." *Baumgartdt v. Wausau Sch. Dist. Bd. of Educ.*, 475 F. Supp. 2d 800, 810 (W.D. Wis. 2007).

18

Plaintiffs do not dispute the applicability of Wis. Stat. § 893.80(4) and have waived all exceptions to immunity other than the known and compelling danger exception. Citing *Cords v. Anderson*, 80 Wis. 2d 525, 259 N.W.2d 672 (1977), they assert that the instant case is similar to an action involving a park manager who knew that a steep gorge existed but failed to post warning signs or to advise superiors. (Doc. 76 at 21-2.)

However, the facts before this court do not establish that St. Francis had knowledge comparable to that known by the park manager in *Cords*. Indeed, viewing the facts in the light most favorable to plaintiffs, St. Francis knew nothing more than Sweet was a poor educator, and that several teachers who did not like Sweet speculated that she had an unusual, weird relationship with NR Doe. Unlike the park manager who knew of a steep gorge in the park yet failed to post signs or notify his superiors, no St. Francis administrator knew of Sweet's illegal relationship with NR Doe, or of the imminent danger the relationship posed to NR Doe. Gridley's statement to Topinka that Sweet and NR Doe's relationship was problematic is not evidence of imminent risk of danger to NR Doe. Smiles and juvenile conduct by Sweet and NR Doe are not enough to conclude that Sweet imposed an imminent risk to NR Doe. Consequently, plaintiffs' fifth count was dismissed.

Next, the court turns to CIC's motion for summary judgment against Sweet's cross-claim for indemnification. CIC argues that Sweet's actions were outside the scope of employment, that sexual conduct is never within the scope of employment for a teacher, and that willful criminal acts are expressly excluded from coverage.

Under Wisconsin law, insurers must defend an entire lawsuit even when only one theory of liability is within coverage, regardless of whether other theories are expressly excluded from coverage. *Krueger Intern., Inc. v. Federal Ins. Co.*, 647 F. Supp. 2d 1024,

19

1031 (E.D. Wis. 2009)(interpreting Wisconsin law). The important consideration is whether the four corners of the complaint indicate a possibility of recovery under the insurance contract. *Id*. Analysis of insurance coverage claims begins with whether the plaintiff is granted coverage initially, and then turns to whether exclusions apply. *American Fam. Mut. Ins. Co. v. American Girl, Inc.*, 2004 WI 2, ¶ 24, 268 Wis. 2d 16, 673 N.W.2d 65. If the plaintiff does not have coverage at the outset, the analysis ends. *Id*.

Also under Wisconsin law, employees act within the scope of employment when the act is fairly and reasonably connected to the natural purpose of the service contemplated. *Cameron v. City of Milwaukee*, 102 Wis. 2d 448, 457-8, 307 N.W.2d 164 (1981). Acts within the scope of employment are those that: (1) are in the nature of service the employee has been engaged to perform; (2) the conduct at issue occurs substantially within the authorized time and space limits of employment; and (3) the conduct is performed with the intent to serve the employer. *Olson v. Connerly*, 156 Wis. 2d 488, 498 n.10, 457 N.W.2d 479 (1990). Where the employee's purpose is purely personal, and does not attempt to benefit or serve the employer, the act is outside the scope of employment. *Korntved v. Advanced Healthcare, S.C.*, 2005 WI App 197, ¶ 13, 286 Wis.2d 499, 704 N.W.2d 597.

Distinguishing a duty to defend from indemnification, Sweet submits that, liberally construed, the cross-claim obligated CIC to defend her by identifying arguable coverage. Sweet contends that her friendship with NR Doe derived from their relationship as educator and student, and that her colleagues' knowledge of the relationship establishes that her relationship with NR Doe was within the scope of her employment by St. Francis. Moreover, Sweet notes that her deposition statement mentions her belief that watching the

20

Milwaukee Bucks game with NR Doe derived from her teaching duties. Additionally, Sweet argues the penal statute exclusion does not apply because of differing definitions of sexual molestation.

As an initial matter, the court notes that Deer Creek's Student/Parent Handbook and and St. Francis's employment policy prohibited sexual conduct between students and teachers. Sweet knew of these prohibitions, and knew that she would be terminated if she were caught in her relationship with NR Doe. However, to prevent the termination of her employment, Sweet and NR Doe agreed to keep their relationship a secret. They also kept their personal conversations and exchange of text messages off campus.

Admittedly, Sweet and NR Doe had on-campus, non-academic discussions regarding matters such as NR Doe's life, Sweet's life, family and general topics. Regardless, there is no evidence before the court showing that such discussions were in the scope of Sweet's employment. Nevertheless, Sweet suggests that evidence of her friendship with NR Doe pulls her romantic relationship into the scope of her employment. The court disagrees and finds that case law does not support NR Doe's claim. Moreover, Sweet has failed to present evidence demonstrating how a romantic relationship with NR Doe, after school hours, off the school campus and in her private house served the educational mission of St. Francis. By express Deer Creek and St. Francis policy, her actions were outside the scope of employment. Sweet knew this, but acted despite her knowledge. Hence, she was not acting within the scope of her employment.

Next, Sweet argues that CIC's insurance contract is ambiguous by providing for but also excluding coverage based on sexual harassment and sexual contact. Specifically,

personal injury coverage expressly includes assault and battery, including sexual molestation coverage, but then excludes coverage for willful violations of penal statutes.

This argument is innovative, but fails because the penal statute violation is an exclusion. Sweet, who admitted that her relationship was outside the scope of her employment and went to great lengths to conceal that relationship from school officials, was never granted initial coverage. Without a grant of coverage, she cannot argue that the exclusion for willful violation of penal statutes does not apply. In any event, she pled guilty to fourth degree sexual assault in violation of Wis. Stat. § 940.225(3m).

Because plaintiffs did not provide evidence to show that Sweet's sexual misconduct as alleged in their complaint was within Sweet's scope of employment, Sweet's cross-claim was dismissed.

Dated at Milwaukee, Wisconsin, this 5th day of December, 2011.

BY THE COURT

/s/ C. N. Clevert, Jr.
C. N. CLEVERT, JR.
CHIEF U. S. DISTRICT JUDGE

22